**COMMISSIONER OF INTERNAL REVENUE v. CEDAR PARK CEMETERY ASS'N, Inc.**

**No. 10041.**

United States Court of Appeals, Seventh Circuit.

July 13, 1950.

Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Howard P. Locke, Helen Goodner, Spec. Assts. to the Atty. Gen., Washington, D. C., for petitioner.

Leonard L. Cowan, Chicago, Ill., for respondent.

Before MAJOR, Chief Judge and DUFFY and SWAIM, Circuit Judges.

DUFFY, Circuit Judge.

This is a petition by the Commissioner of Internal Revenue for a review of a decision of the Tax Court upholding a challenge by the taxpayer to certain deficiencies determined by the commissioner for the taxable years 1939, 1940, and 1941. The two questions for decision are: first, whether the taxpayer is entitled to exclude from gross income in said taxable years the portion of the sales price of its cemetery lots which it segregated and paid to the trustee of a perpetual care trust fund; and second, since taxpayer had recovered in prior years its cost basis for two of the four sections of the cemetery, whether zero must be used as the basis in computation of gain or loss in sales of burial lots in subsequent years. Involved in the latter question is whether Sec. 19.22(a)-11 of Treasury Regulations 103 applies to the sale of burial lots by cemetery companies.

Taxpayer (hereinafter called "association") was incorporated for profit in 1923 under the General Corporation Act of Illinois. It kept its books on the accrual basis. Leonard L. Cowan was vice president from 1933 to 1941 inclusive, and chairman of the board of directors during the taxable years.

In 1923 the association purchased 66-⅔ acres of land in a suburb of Chicago for $61,500; in 1924 it bought an adjoining tract of 26-⅔ acres for $56,000. It first improved for burial purposes 35.02 acres out of the original tract, which it designated as "Old Section" and which included 1804 burial lots. In 1927 it improved an additional 16-⅓ acres, consisting of 995 burial lots, and identified this unit as "New Section." In 1938 the association developed and began to sell lots in "Birch Section" containing 236 lots, and in 1940 and 1941 it developed and sold lots in "Cherry Section," or "Fourth Improvement," containing 545-½ lots. Burial space was sold in these sections in the taxable years 1939, 1940, and 1941.

On December 31, 1923, the association set up on its books a reserve for perpetual care in the amount of $119,064, by debiting that amount to the cost of unsold lots and crediting the reserve account. This sum was computed by multiplying the number of unsold lots in the Old Section, 814, by $66. In succeeding years other sums were credited to this account, but no money was actually paid into a separate trust fund. The association claimed that the $66 per lot was properly included in determining the cost to it of all the lots in the cemetery, and that 10% of the sales price of its lots, which was to be set aside for perpetual care, was properly deductible from the association's income. This court held in Cedar Park Cemetery Association, Inc., v. Commissioner of Internal Revenue, 7 Cir., 1933, 67 F.2d 699, as stated in the companion case of Acacia Park Cemetery Assn., Inc., v. Commissioner of Internal Revenue, 7 Cir., 67 F. 2d 700, 703, that such addition to the cost or deduction for accrued liabilities would not be permitted unless the sums were actually paid into a separate trust fund.

In an attempt to conform to the ruling of this court the association in 1934 executed a trust agreement with the Chicago City Bank and Trust Company. The agreement recites that the association is obliged by its agreement with lot owners to set aside and maintain a perpetual care fund for the care and maintenance of Cedar Park Cemetery, and that it desires to set aside and keep separate from all other assets of the association a special trust fund to be invested in safe interest or income bearing securities or to be used for the payment of premiums on life insurance policies maintained for the benefit of the trust fund. It is stated that the purpose of the fund is to keep the cemetery permanently in good condition and repair. The association agreed that it would from time to time deposit with the trustee sums equal to 10% of the net sale price of lots sold by it from and after January 1, 1934, until the aggregate principal sum amounted to $200,000. The association also deposited with the trustee life insurance policies which it took upon the life of Leonard L. Cowan in the aggregate amount of $100,000. These policies were assigned to the trustee who was given the sole power to claim any proceeds from said insurance policies. The agreement also provided that no shareholder, officer, or creditor of the association, or any lot owner, should have any title in or to any of the assets of the trust estate. Provision was made for the investment of funds by the trustee, but the association had the right to approve the investments.

On June 22, 1939, the board of directors of the association passed a resolution that thereafter 20% of the gross contract sales price of each lot should be placed in the perpetual care trust fund. The company abided by this in the sale of lots during the balance of 1939 and during the years 1940 and 1941.

From January 1, 1939, to June 22, 1939, burial lots were sold under contracts containing the following provision, "The purchase price hereof shall include Perpetual Care of the above described lot out of the Perpetual Care Fund set aside for such purpose by Cedar Park Cemetery Assn., Inc." After June 22, 1939, the same form of contract was used but was stamped with a rubber stamp, "Includes 20% Perpetual Care."

During the taxable years practically all purchasers of burial lots paid for them in installments and the deeds were issued when all installments had been made. Prior to June 23, 1939, the association paid 10% of the contract price and after said

date 20% thereof to the trustee from the last installments. Prior to December 31, 1940, collections for perpetual care on outstanding contracts were not sufficient to enable the trustee to meet the premiums on the life insurance policies which had been assigned to it, and the association advanced sufficient sums to pay them. As of December 31, 1940, the credits to the trust fund became sufficient to produce a credit balance and thereafter the association made only the monthly payments to the trustee pursuant to the trust agreement.

In the taxable years the association excluded from the figure for its gross sales the amount allocable to perpetual care under its contracts with the lot holders. The commissioner ruled that such sums should have been included under gross income and that no portion thereof is deductible under Sec. 23(a), 26 U.S.C.A. § 23(a), or any other provision of the Code. The Tax Court held that a present and continuing obligation to segregate the trust fund existed, and that the perpetual care funds were properly excluded from the net amount of accruable receipts.

The commissioner argues that the provisions of the trust agreement giving the association the right to remove the trustee, to designate a successor trustee, and to supervise the investments show that the trust was not a valid one for the benefit of the purchasers of the burial lots. Also the commissioner argues that as the trust income was usable for the care, upkeep and maintenance of the entire cemetery, such provision was for the benefit of the association.

The amounts deposited by the association with the trustee are irrevocably dedicated to the trust fund and no person has any right or authority to decrease the principal of the trust. No amendment or modification of the trust may be made which will in any way reduce or impair the principal of the trust or divert the income to any other purpose than the care, improvement and maintenance of the cemetery.

The manner and method of the association's bookkeeping show that it claimed no part of the monies intended for allocation of the trust fund. The amounts allocable to perpetual care were shown as debits on taxpayer's books, as "Accounts Receivable—Perpetual Care," and a liability, "Perpetual Care Liability—Sales," in the same amount. The association merely acted as a collection channel for the money which would be deposited in the trust fund.

The Commissioner lays considerable stress on the argument that the income from the trust fund could be used to benefit the cemetery as a whole, rather than for the care of the various lots. We do not think that fact is significant. The owners of cemetery lots are necessarily concerned with more than the upkeep of their particular lot. They want assurance that after all the lots have been sold and at a time when the stockholders of the association will no longer receive any profits from the sale of lots, the roads, trees, shrubbery and grass in all parts of the cemetery will be maintained in a fitting and proper manner.

The Commissioner also argues that under the trust agreement the income and if necessary the principal of the fund may be used to pay premiums on life insurance policies owned by the trust. But the association as such has no rights to the proceeds of the policies. The trustee is the sole beneficiary and is the only one entitled to collect the proceeds. The payment of premiums by the trustee is merely an expenditure to maintain a trust investment.

In American Cemetery Co. v. United States, D. C., 28 F.2d 918, the court held that if a trust is created and a taxpayer is bound either by its agreements or by statute to pay certain sums into a trust fund, and the principal and interest from the trust do not inure to the benefit of the taxpayer, the sums thus paid into the trust fund are not considered as part of the taxpayer's income. In Portland Cremation Ass'n v. Commissioner of Internal Revenue, 9 Cir., 31 F.2d 843, the court pointed out that decisions of the Board of Tax Appeals have held that money received from sales of lots and placed in a maintenance fund is not properly deductible unless the taxpayer has placed the funds beyond its power to use, disburse or diminish. The court there referred to Metairie Cemetery Ass'n, 4 B.T.A. 903, where the contracts

provided for perpetual care and it was held that a valid trust was created and that the funds, having been received in trust for the specific purpose of caring for the burial places, did not give rise to taxable income.

We think that the taxpayer herein created a valid trust for the benefit of the purchasers of the burial lots. We agree with the Tax Court that a present and continuing obligation existed and that perpetual care funds were properly excluded from the gross income of the association.

The second question here for decision is the claim of the commissioner that the association is not entitled to deduct any cost basis in determining gain or loss on the sale of lots in Old and New Sections, because in years prior to December 31, 1938, it had recovered more than the correct adjusted cost for such burial space. When before the Tax Court, the Commissioner made the same contention as to lots sold in Birch Section and Fourth Improvement; but he has now abandoned the claim regarding these two sections.

The recovery of excess costs by the association occurred in the years 1926 to 1930, and 1933 to 1938, by reason of the inclusion of items in the cost of lots sold which were later held to be improper. In some of these years the inclusion of items of cost later eliminated gave no tax advantage to the association, because in 1926-1927 and 1933-1938, the association operated at a loss.

The Tax Court rejected the contention of the Commissioner and we approve the statement in its opinion as follows: "The second issue must yield to the fundamental principle that property purchased in bulk is to be dealt with by attributing an aliquot portion of the basis to its several parts where these are disposed of separately. Regulations 103, section 19.22(a)-11; (citing cases). Respondent's contention that he permitted petitioner in prior years to offset so large a portion of the cost against earlier sales that no part of the original basis remains cannot alter the principle. Commissioner [of Internal Revenue] v. Laguna Land & Water Co., 9 Cir., 118 F.2d 112. The question is as to the gain realized in the instant tax years from the sale of the lots that were sold in those periods. * * * The question is hence not what is the basis for the entire property but what is the basis for the lots sold in the instant years. * * *"

Regulations 103, Sec. 19.22(a)-11, reads: "Sale of real property in lots.—If a tract of land is purchased with a view to dividing it into lots or parcels of ground to be sold as such, the cost or other basis shall be equitably apportioned to the several lots or parcels and made a matter of record on the books of the taxpayer, to the end that any gain derived from the sale of any such lots or parcels which constitutes taxable income may be returned as income for the year in which the sale is made. This rule contemplates that there will be gain or loss on every lot or parcel sold, and not that the capital in the entire tract may be recovered before any taxable income shall be returned. The sale of each lot or parcel will be treated as a separate transaction, and gain or loss computed accordingly."

The Commissioner stresses the words "as such" in the first clause of the first sentence of the above-quoted section of the regulation, and argues that "as such" means that a purchaser of a lot or parcel of ground acquires exactly what the seller had in that parcel and not something less, that when a cemetery association acquires land it does not sell the land "as such," that the remuneration that a cemetery association receives on the sale of a lot is a prepaid rental for indefinite enjoyment of the use of that particular lot.

The regulation itself does not distinguish between cemetery lots and ordinary real estate lots. Although the purchaser of a cemetery lot from the association does not acquire a fee simple title thereto, he does secure a deed which gives him exclusively the only use for which that plot of land can thereafter be used. The fee title has lost its real value and the interest which the association retains is a liability, rather than an economic benefit. A purchaser of a cemetery lot acquires a property right in the lot which the law recognizes, which can be passed to his heirs. Mount Hope Cemetery Ass'n v.

Commissioner, 37 B.T.A. 671. We do not think the words "as such" in the regulation place the purchasers of cemetery lots on a different basis for tax purposes than purchasers of ordinary real estate lots which have been subdivided from a larger tract.

We think Commissioner of Internal Revenue v. Laguna Land & Water Co., supra, relied upon by the Tax Court, was correctly decided. It was there held that for tax purposes the law looked upon each lot sold from a tract as if it had been purchased separately. That case also held that an improper deduction from gross receipts from a specific piece of property sold in one year could not be corrected by refusing a deduction upon the sale of a different piece of property in a subsequent year in determining the taxable income in the latter year.

 The Commissioner seeks to avoid the effect of the Laguna decision by pointing out that cemetery lots were not involved in that case. He vigorously insists that Regulations 103, Sec. 19.22(a)-11 does not apply to burial lots. If this regulation does not apply, it is difficult to see how a gain could be ascertainable until such time, if ever, as the association had recovered its entire capital investment. Whether any gain is involved could not be ascertained until the cemetery was completely improved and sufficient burial space had been sold to cover such complete cost. Such a construction would be contrary to the intent and the purpose of the Revenue Act. The federal income tax system is based on an annual accounting. Heiner v. Mellon, 304 U.S. 271, 275, 58 S.Ct. 926, 82 L.Ed. 1337. The purchase of real estate, its subdivision, and sale in parcels is a liquidating business. The Commissioner has constantly maintained and the Board of Tax Appeals and the Tax Court have consistently held that the cost of real estate purchased in bulk and later divided into lots must be apportioned among all the lots and the income returned upon sales in each year, regardless of the number of lots remaining undisposed of at the close of the tax year. See cases cited in Heiner v. Mellon, supra.

Regulations 103, Sec. 19.43–2, applicable to the association for the tax years in question (superceded by Regulations 111, Sec. 29.43–2, effective to years beginning after December 31, 1941) provides: "Each year's return, so far as practicable, both as to gross income and deductions therefrom, should be complete in itself, * * *. The expenses, liabilities, or deficit of one year cannot be used to reduce the income of a subsequent year. A taxpayer has the right to deduct all authorized allowances, and it follows that if he does not within any year deduct certain of his expenses, losses, interest, taxes, or other charges, he cannot deduct them from the income of the next or any succeeding year. * * *"

In this case, neither fraud, nor bad faith, nor concealment of facts by the association is claimed by the Commissioner. He had adequate notice of the inclusion of the disputed items in the tax returns of the association. We are of the opinion that the ruling of the Tax Court was correct on both questions here for determination, and its decision will therefore be affirmed.